# EXHIBIT A

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

**Page 14**

1 requisition form, or do you submit some kind of a
2 request to replace that?
3 A. I don't submit. You just turn in your thing,
4 and sign off on one.
5 Q. You turn in your empty container and sign off,
6 and they give you a new one?
7 A. Yes, sir.
8 Q. Did you -- did you use your Mace on this
9 particular night?
10 A. Yes, sir.
11 Q. You, yourself, used your Mace?
12 A. I did, sir.
13 Q. Did you use the whole can?
14 A. No, sir.
15 Q. Did you have any left?
16 A. Whatever is there.
17 Q. Whatever is there?
18 A. Yes, sir.
19 Q. You don't use very much Mace?
20 A. No, sir, not at all.
21 Q. Were other officers using Mace?
22 A. Just me.
23 Q. You were the only officer that used Mace?
24 A. At the scene, yes, sir.
25 Q. You didn't see Greg Esparza use it?

**Page 15**

1 A. No.
2 Q. Or Martin Vigil?
3 A. No, sir. I was not right there at the time.
4 I was already taken to the unit.
5 Q. We are going to go through all of that then.
6 This is the same can of Mace that you had on
7 that night?
8 A. Yes, sir. I don't recall getting a new one.
9 That is the only time I used my Mace, and it is almost
10 gone.
11 Q. Now, when you want to replace it, you just go
12 to Solomon Romero, who is the equipment issuing officer?
13 A. Yes, sir.
14 Q. How are you equipped when you go out on the
15 street? As I look at you, I see you are wearing a
16 bullet-proof vest?
17 A. Yes, sir.
18 Q. You have a radio?
19 A. Yes.
20 Q. You have a taser, you have a gun, you have
21 handcuffs?
22 A. Yes, sir.
23 Q. You have a baton?
24 A. No, sir.
25 Q. You don't use a baton?

**Page 16**

1 A. No, sir.
2 Q. Do you have one of those collapsible -- little
3 collapsible things that they use?
4 A. I do have one in my unit, yes, sir.
5 Q. What other equipment are you issued?
6 A. That is about it. Mace, and that is about it,
7 sir.
8 Q. Mace, taser, gun, and of course your badge and
9 the handcuffs. Are all other officers similarly
10 equipped that you know of?
11 A. Yes, sir.
12 Q. Were the officers that you saw there that
13 night equipped the way you are?
14 A. I believe so, sir, yes, sir.
15 Q. What about a gag bag? What is a gag bag?
16 A. Basically, it is not really a gag bag. It is
17 when people spit on you -- to keep them from spitting,
18 they put like -- it has like a net over the face that
19 covers from spitting at you to spread diseases and
20 basically protect us when we are getting spit at.
21 MR. BASHAM: Dan, I have one if you want to
22 see it.
23 MR. MARLOWE: Sure. Can we put that in as an
24 exhibit, do you think?
25 MR. BASHAM: I would be happy to.

**Page 17**

1 MR. MARLOWE: All right.
2 Q. (By Mr. Marlowe) Is that the gag bag that was
3 used on Shannon Baum that night?
4 (Exhibit 1 marked.)
5 A. Sir, I didn't see what she had. I was at the
6 hospital.
7 Q. All right. So that is what I was going to ask
8 you. Let's just go from the beginning on this one.
9 You were at the car wash; is that correct?
10 A. Yes, sir.
11 Q. Were you dispatched there, or were you just
12 there?
13 A. I was cleaning my car out, sir.
14 Q. You were actually cleaning your car. What
15 time of the day or night was that?
16 A. I just started a shift, so it was a little
17 after 6:00.
18 Q. A little bit after 6:00 in the evening?
19 A. In the evening, yes, sir.
20 Q. When did you first notice or first see Shannon
21 Baum?
22 A. The employee from inside the store came out
23 and told me that he saw an individual that looked
24 intoxicated on the third bay.
25 Q. On the third bay?

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

**Page 18**

1  A.  Yes, sir.
2  Q.  That employee was --
3  A.  Martin.
4  Q.  Martin Vigil?
5  A.  No.  Martin Gonzalez, I think his last name
6  is.
7  Q.  Martin Gonzalez --
8      MR. BASHAM: Dan, let her finish answering the
9  question.
10     MR. MARLOWE: Sorry.
11     MR. BASHAM: That is for the benefit of the
12  court reporter.
13  Q.  (By Mr. Marlowe) Did you ever see Yvonne
14  Gonzalez?
15  A.  After everything, yes, sir.
16  Q.  Did anybody ever come to your aid, like Martin
17  or Yvonne?
18  A.  Just Martin and Yvonne.
19  Q.  What did they do?
20  A.  To come to my aid?
21  Q.  Uh-huh.
22  A.  I just saw feet coming towards me and "get off
23  her." I can hear him yelling and actually physically
24  got her off of me.
25  Q.  Martin did?

**Page 19**

1  A.  Yes, sir. I heard his voice.
2  Q.  Okay.  Martin is the one that told you that
3  there was a person in the third bay that appeared to be
4  intoxicated?
5  A.  Yes, sir.
6  Q.  What did you do with that information?
7  A.  At that time, I saw her drive -- saw the
8  vehicle drive around and then parked by the vacuum
9  cleaners, so I walked, and I approached her and told her
10  why I was there.
11  Q.  Did you ever instruct her to drive her car to
12  the vacuum?
13  A.  No, sir.
14  Q.  So she had already driven the car there, and
15  you went over and approached her?
16  A.  Yes, sir.
17  Q.  Where was she when you approached her?
18  A.  She was pulling into the vacuum cleaners.
19  There is like a portal kind of like, and there is some
20  vacuums that are lined up, and she had just pulled in as
21  I was walking around.
22  Q.  What did you do?
23  A.  I walked up to her and I advised her why I was
24  there and told her why I was going to speak with her.
25  Q.  Why was that?

**Page 20**

1  A.  It was reported to me that she possibly might
2  be intoxicated on something.
3  Q.  Did she say anything?
4  A.  I don't recall.  I might have to look at my
5  notes for that.
6  Q.  Did you then begin a DWI investigation on her?
7  A.  I first started with an HGN, which is look
8  into the eyes and see if I find any clues or not, which
9  I did.
10  Q.  The HGN, how far away from her were you?
11  A.  From her sitting in the car from -- it was a
12  pretty decent distance, probably a little closer from me
13  to you right now.
14  Q.  About three feet away?
15  A.  Yes, sir, probably a little bit closer.
16  Q.  She was not in the car, she was out of the car
17  at that time, wasn't she?
18  A.  No.  She was getting out of the vehicle, yes,
19  sir.
20  Q.  So she was getting out of the vehicle, and
21  that was based on your instruction for her to get out of
22  the vehicle, I would assume?  Is that right?
23  A.  After the HGN.
24  Q.  You didn't do the HGN while she was in the
25  car; did you?

**Page 21**

1  A.  I have to look at my report, sir, before I
2  answer that question.
3      MR. BASHAM: If you don't recall, you don't
4  recall.
5  Q.  (By Mr. Marlowe) Do you have your report with
6  you?
7  A.  No, sir.
8  Q.  Do you have it in your car?
9  A.  No, sir.
10  Q.  Based on your experience, do you do HGNs while
11  people are seated in their vehicle?
12  A.  It depends. 90 percent of the time, yes, sir.
13  Q.  90 percent of the time, they are seated in the
14  vehicle?
15  A.  Sometimes, I get them out, but I want to look
16  at the eyes first before I start anything.
17  Q.  Explain how an HGN is conducted.
18  A.  Basically, you give them a 45-degree angle as
19  they are watching the tip of your finger, or whatever
20  you have them focusing on, and it is an uncontrollable
21  bounce in their eyes because they have -- lets you kind
22  of know if they are intoxicated or not, and it is
23  involuntary, so they don't have no control over that.
24  Q.  So when you do an HGN, you have them stare at
25  your finger?

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

Page 22

1  A.  Yes, sir.
2  Q.  Not move their head?
3  A.  Yes, sir.
4  Q.  Did you instruct her to stare at your finger
5     and not move -- not move her head?
6  A.  Yes, sir.
7  Q.  Then you moved your finger from side to side?
8  A.  I want to say it was my finger, possibly a
9     pen.
10 Q.  Or a pen or --
11 A.  Yes, sir.
12 Q.  -- penlight or whatever.  At that point, you
13    are looking at her eyes; correct?
14 A.  Yes, sir.
15 Q.  You go all the way to one side to see what the
16    movement of the eyes is -- maximum deviation?
17 A.  Yes, sir.
18 Q.  Then you do it to the other side?
19 A.  Yes, sir.
20 Q.  Then you go up, and then you go down; right?
21 A.  Yes, sir.
22 Q.  Vertical and -- vertical nystagmus to see if
23    there is anything like that.  You test for resting
24    nystagmus?
25 A.  Yes, sir.

Page 23

1  Q.  Do you use a flashlight to see her eyes, or do
2     you use the headlights of your car?
3  A.  It was light out, sir.
4  Q.  It was light out?
5  A.  Yes, sir.
6  Q.  So are you saying then that you don't remember
7     whether she was out of the car or in the car when you
8     did the nystagmus testing?
9  A.  I need to look at my report, sir.  I don't
10    want to answer that question.
11 Q.  Don't want to answer it at all?
12 A.  I want to look at my report, sir.
13 Q.  Okay.  How do you determine -- I will withdraw
14    that question.
15       So when she was -- after you had finished the
16    nystagmus test, you are saying that you don't remember
17    whether she was in the car or whether she wasn't in the
18    car?
19 A.  I just remember asking her -- the next step we
20    were going to do was the walk and turn, and I remember
21    her wearing high heels, so I gave her an option to take
22    them off, or if she was comfortable to keep them on, I
23    remember that, and she says she was going to take them
24    off, and I remember her holding onto the driver's door,
25    leaning over to grab a heel, and she told me, "Fuck

Page 24

1  this," and jumped in her car, so I had to get in and go
2  after her.  She was trying to take off.
3  Q.  So she was out of the car then?
4  A.  At that time, yes, sir.
5  Q.  You don't remember whether she was out of the
6     car before or after the horizontal eye nystagmus test?
7       MR. BASHAM: Objection, asked and answered.
8       Go ahead and answer it again.
9  Q.  (BY MR. MARLOWE) I am a little confused
10    because I don't know whether she was in the car or out
11    of the car.
12       MR. BASHAM: Objection.
13 A.  I have to look at my report.
14       MR. BASHAM: Asked and answered.
15 Q.  (BY MR. MARLOWE) At one point, she got out of
16    the car?
17 A.  Yes, sir.
18 Q.  Did you instruct her to get out of the car?
19 A.  Yes, sir.
20 Q.  That was so you could perform the field
21    sobriety test?
22 A.  To make sure she was okay to drive, yes, sir.
23 Q.  Did you tell her why you were asking her to
24    get out of the car?
25 A.  Yes, sir.  She agreed.

Page 25

1  Q.  There was at some point where she said, "Fuck
2     this"?
3  A.  Yes, sir.
4  Q.  And jumped back into her car?
5  A.  Yes, sir.
6  Q.  Did she start her car?
7  A.  She tried to, but she couldn't get it into
8     gear.
9  Q.  She couldn't --
10 A.  Could not get it into gear.  She was pressing
11    the gas.
12 Q.  She couldn't get it into gear?
13 A.  I remember leaning in, trying to take the keys
14    out with her.
15 Q.  But the car was not started?
16 A.  Right now, I can't recall.  I remember trying
17    to take the keys off and her pushing the gas.  She was
18    trying to get into gear is what she was trying to do, I
19    remember that, because I was in the car with her.
20 Q.  Was it an automatic or stick-shift?
21 A.  I don't know, sir.  I just know there was
22    something -- I wasn't too sure if it was a stick or just
23    a drive, go, whatever, but I remember her pushing the
24    gas, and I was panicking, trying to get the key out.
25 Q.  Did you reach into the car and around the

Case 1:13-cv-01060-RB-KK   Document 45-1   Filed 10/28/14   Page 5 of 25

Shannon Baum v.                                          Michelle Ortega
Officer Michelle Ortega, et al.                         October 10, 2014

**Page 26**

1 steering wheel and grab the keys?
2 A. Yes, sir.
3 Q. You didn't have to turn the car off because
4 the keys came right out; right?
5 A. No, they didn't come right out. I had to
6 fight to get them out.
7 Q. Fight with her to get them out?
8 A. Fight the ignition to get them out.
9 Q. When you did that, did you take the keys out
10 by reaching in and facing the steering wheel, reach
11 around it, or was your back to the steering wheel?
12     MR. BASHAM: Objection as to form.
13     Go ahead and answer.
14 Q. (By Mr. Marlowe) Do you understand the
15 question?
16 A. No, sir.
17     MR. BASHAM: Can you break it down into two?
18 Q. (BY MR. MARLOWE) I will break it down into
19 two.
20     When you reached in to get the keys, were you
21 facing the steering wheel?
22 A. Yes, sir.
23 Q. Where was Shannon Baum?
24 A. Driver's seat.
25 Q. So you reached across the front of her?

**Page 27**

1 A. We were both reaching for the key.
2 Q. Were you in the car at that point?
3 A. Half my body was in the car, sir.
4 Q. So from the waist up, you were --
5 A. Trying to get her out, trying to stop --
6     MR. BASHAM: Let him finish.
7 Q. (BY MR. MARLOWE) That is all right. I
8 understand.
9 A. I am sorry.
10 Q. You were trying to get the keys out of the
11 car, and she was trying to get the keys also; is that
12 right?
13 A. I just remember trying to get the keys out.
14 It was a struggle, sir.
15 Q. Okay. What was she doing to you?
16 A. To be honest, sir, I just remember trying to
17 get keys out. I don't know exactly what she was doing
18 to me, but I was trying to gets the keys out.
19 Q. Did it ever come to a point where you and she
20 started to struggle?
21 A. Yes.
22 Q. Describe what that struggle was.
23 A. The struggle is me trying to get her out of
24 the car, and when we did finally come out, she landed on
25 top of me.

**Page 28**

1 Q. How were you trying to get her out of the car?
2 A. I was trying to cuff her, I believe. I have
3 to look at my report, but I remember trying to grab her
4 and pull her out, almost like a bear hug and pulling her
5 out.
6 Q. So at some point -- correct me if I am wrong,
7 but at some point -- did you have the keys in your hand
8 at that point?
9 A. No, sir.
10 Q. Did you ever get the keys out of the ignition?
11 A. I don't recall, sir.
12 Q. At some point, were you turned around, and
13 were you facing her --
14 A. Yes.
15 Q. -- in order to get a bear hug on her?
16 A. Trying to get her out of the car, yes, sir.
17 Q. Were you trying to pull her out like trying to
18 pull her whole body out, or were you pulling her head
19 out?
20     MR. BASHAM: Objection as to form.
21     Go ahead and answer.
22 A. I just remember pulling. I am not too sure if
23 it was her arms or whatever, but pulling her out of the
24 car. It was a struggle to get her out.
25 Q. (By Mr. Marlowe) Was she like holding on to

**Page 29**

1 the steering wheel?
2 A. She was holding on to something, sir. I just
3 couldn't get her out.
4 Q. So she was resisting getting out?
5 A. Yes, sir.
6 Q. At some point, she came out all of a sudden,
7 is that a good way to put it?
8 A. I believe so, sir.
9 Q. What I am -- go ahead.
10 A. I am sorry. I just remember when we finally
11 came out, I fell back.
12 Q. So would it be fair to say that while you are
13 tugging to get her out, and you are not being able to
14 get her out, somehow she lost her grip and she came out
15 all of a sudden? Do you know what I am saying?
16 A. Yes, sir.
17 Q. Is that a fair statement?
18 A. Yes, sir.
19 Q. So you are pulling on her, she suddenly comes
20 out of the car, and you fall backwards, and she lands on
21 top of you?
22 A. Yes, sir.
23 Q. Okay. What happened after that? We can take
24 a break.
25     MR. BASHAM: Let the record reflect that the

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

Page 30

1  witness is beginning to cry.
2     MR. MARLOWE: We can take just take a small
3  break so she can regain her composure.
4     MR. BASHAM: Is there a question on the table?
5     MR. MARLOWE: No. The question on the table
6  was, what happened after that?
7     MR. BASHAM: Do you want to take a break?
8  Let's go talk.
9     (Recess taken at 9:57 a.m. and reconvened at
10    9:58 a.m.)
11 Q. (BY MR. MARLOWE) The last question was -- we
12 left off where you had pulled her out of the car, and
13 she had come out all of a sudden and landed on top of
14 you, and you fell backwards?
15 A. (Witness nods head.)
16 Q. The next question was, what happened after
17 that?
18 A. We rolled around for a while, back and forth.
19 I remember trying to get up. I tried to get up. I
20 tried. I remember being hit, my hair was being pulled,
21 I was trying to call for help, I couldn't. My radio was
22 flying everywhere. So we were rolling around for a bit,
23 and I finally was able to get her off.
24    I like blacked out. I remember right now, I
25 am just -- anyway, all I remember was getting ahold of

Page 31

1  her hair, she got ahold of mine, we both came down
2  knee-to-knee. She was right next to me. I looked over,
3  and I saw this person standing there watching us, and --
4  "My God, Lady, help me," and I am holding on to hers,
5  and she is holding on to mine.
6     She started tugging at my gun. She was trying
7  to get my gun out. She said, "I am going to fucking
8  kill you with your own gun, you bitch."
9     MR. BASHAM: Let her finish.
10    Are you done?
11    THE WITNESS: No.
12    MR. BASHAM: Continue.
13    THE WITNESS: She was tugging it, and tugging
14 and tugging. I kept thinking to myself, I am going to
15 go home. I am holding on to her, and holding on to her,
16 and, "Lady, help me." I see her, and I heard this guy
17 running, "Get the "F" off of her," and I feel him
18 push -- like pull her off of me, and he pushed her off
19 of me, and I remember looking around.
20    I am all distraught, my hair is a mess, my
21 uniform is torn up, and she didn't get this out, wasn't
22 able to, and I couldn't find my Mace. It is over there
23 in the corner, it is over there, so I grabbed it. She
24 tried to get back up, and I Maced her, and I turned
25 around, I couldn't breathe. I fainted, fell over. That

Page 32

1  is when the guys finally pulled in.
2  Q. (BY MR. MARLOWE) Are you finished?
3     MR. BASHAM: Are you done?
4     THE WITNESS: Yes.
5  Q. (BY MR. MARLOWE) Now I want to ask you a
6  couple of questions about what you have just said.
7     When you said that you were holding on to each
8  other and rolling around, can you tell me what you mean
9  by that?
10 A. It is like a cat fight. Try to save -- trying
11 to get somebody off of you. It is rolling around. I
12 can't explain, to be honest with you, sir. Basically,
13 you are surviving. I was trying to survive. She was
14 trying to hit me. She was trying to hurt me.
15 Q. She had her arms around you?
16 A. Yes.
17 Q. You had your arms around her, and you guys are
18 rolling around?
19 A. It was more of throwing punches. She is
20 hitting me.
21 Q. How many times did she hit you?
22 A. I can't count, sir.
23 Q. Was she hitting you with a closed fist?
24 A. I just remember being hit and my hair being
25 pulled.

Page 33

1  Q. Do you remember how many times she hit you?
2  A. No.
3  Q. Did she hit you solidly?
4  A. I just felt hits. I can still feel them. I
5  can feel hits.
6  Q. To your body or to your face?
7  A. Head, hair. My vest, couldn't feel too much
8  there.
9  Q. How many times do you think she hit you?
10 A. I don't know, sir. We were there for a while.
11 I want to say a good minute or so plus.
12 Q. Was she hitting you the whole time?
13 A. Yes, sir.
14 Q. Yes?
15    MR. BASHAM: That was a "yes."
16    MR. MARLOWE: Okay.
17 Q. (BY MR. MARLOWE) Then this individual came
18 over and pulled her off of you?
19    MR. BASHAM: Answer out loud.
20 A. Yes, sir.
21 Q. (By Mr. Marlowe) Were you both still on your
22 knees at that point?
23 A. Yes, sir.
24 Q. Do you remember what direction you were faced
25 in?

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

---

Page 34

1  A.  Well --
2  Q.  Let me see.  I want to help you.
3      Were you faced like toward the mountains, or
4  were you faced the other direction?
5      MR. BASHAM:  Objection as to form.
6      Go ahead and answer.
7  A.  The bays are this way, they are facing north
8  and south.  Probably the south direction.
9  Q.  (By Mr. Marlowe)  Okay.  So you were both on
10 your knees?
11 A.  Yes, sir.
12 Q.  At that point, this other individual stepped
13 in, is that right, while you were still both on your
14 knees?
15 A.  Yes, sir.
16 Q.  She is bear hugging you?
17 A.  She is trying to take my gun, sir.
18 Q.  Was she -- she wasn't hugging you anymore?
19 A.  She was still pulling my hair with this hand,
20 but this hand was over here on my gun.
21 Q.  So was she holding you close to her?
22 A.  I was holding the gun tight to me.
23 Q.  You were holding the gun?
24 A.  I was with the hand like this and holding this
25 tight, trying to keep her from taking my gun.

---

Page 35

1  Q.  Okay.  At what point did somebody come over
2  and pull her back away from you?
3  A.  While I was holding my gun.
4  Q.  Did that person completely separate you, or
5  was he struggling to separate you when backup arrived?
6  A.  I just heard him telling her, "Get the 'F' off
7  her," and all I felt is him pull her from me.
8  Q.  When did the -- when did the backup arrive?
9  A.  Shortly after.
10 Q.  Do you know how -- who called them?
11 A.  I think they came because I wasn't answering
12 my radio.  They were trying to check -- 78 checks.  What
13 that means is to see if I am okay.
14 Q.  Did they know -- how would they know where you
15 were?
16 A.  I told them on the radio.
17 Q.  So at some point, you were able to get
18 dispatch your position?
19 A.  I told them what I was doing before I started.
20 Q.  You told them that you were going to clean
21 your car out before you started your shift?
22 A.  Yes, sir, then I told them I had a report of a
23 drunk person I will be checking up on right now, pulling
24 in, so they knew what I was doing.
25 Q.  So what happens is that they knew you were

---

Page 36

1  there based on your prior information?
2  A.  Yes, sir.
3  Q.  And they probably did a 78 check?  Is that
4  what you said?
5  A.  Yes, sir, and they didn't -- I didn't respond,
6  and that is --
7  Q.  Go ahead.
8  A.  That is why the officers went to make sure I
9  was okay, because I didn't respond.
10 Q.  I assume you know that by talking with some of
11 the officers about how the whole thing came about?
12 A.  Yes, sir.
13 Q.  All right, and when the backup arrived, who
14 arrived first?
15 A.  I saw Greg.
16 Q.  Greg Esparza.
17 A.  Then I saw Martin.  I am not too sure who
18 drove up first.
19 Q.  Did anybody else arrive?
20 A.  Supervisors, because they have to be there for
21 that.
22 Q.  So first Greg Esparza arrives?
23 A.  I remember seeing Greg.  I look up and see
24 Greg.  I am not saying who pulled up first, but when I
25 looked up, I saw Greg.

---

Page 37

1  Q.  Were you still on your knees at that point?
2  A.  Yes, sir.
3  Q.  Was she still holding on to you?
4  A.  No, sir.  We have already been separated.
5  Q.  Okay.
6  A.  That was when I collapsed.  That is when I
7  lost my breath.
8  Q.  Was she still on her knees?
9  A.  I have already Maced her, sir.  I was facing
10 the other direction.
11 Q.  So you had Maced her and then --
12 A.  Turned around.
13 Q.  You turned your back on her?
14 A.  She was on the floor, sir.
15 Q.  Was she laying on the floor, or was she
16 kneeling?
17     MR. BASHAM:  Objection as to form.
18 A.  I don't recall, sir.
19 Q.  (By Mr. Marlowe)  You don't recall?
20 A.  No, sir.
21 Q.  Would it be in your report?
22 A.  It should be in my report.
23     MR. MARLOWE:  You will get me a copy of her
24 report; right?  I don't have her report, actually.
25     MR. BASHAM:  I am just wondering if I have a

---

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

Page 46

1  A.  Yes, sir.
2  Q.  Then you went to the hospital after that?
3  A.  Yes, I did.
4  Q.  Did you see anything that happened after that?
5  A.  No, sir.  I was sent home after that.
6  Q.  You were sent home after that, and that means
7    that Greg Esparza and Martin Vigil basically took over,
8    would that be a fair statement?
9  A.  I wasn't there.
10 Q.  Did you ever get a handcuff on her?
11 A.  One.
12 Q.  One cuff on her?
13 A.  How it got there, I don't remember.
14 Q.  But did you get a cuff on her?
15 A.  Yes, sir.
16 Q.  That was a -- it was locked on to her,
17   basically?
18 A.  Yes, sir.
19 Q.  So she had one free hand and one handcuff?
20 A.  Yes, sir.
21 Q.  When she was fighting with you and hugging
22   you, was that cuff still on her?
23 A.  It never came off.
24 Q.  So did you put the cuff on her while she was
25   in the car before you pulled her out?

Page 47

1  A.  I have to look at my report, sir, for that
2    question.
3  Q.  You never saw -- you never saw any other
4    police officer complete handcuffing with your cuffs?
5  A.  No, sir.
6  Q.  When you cuff somebody, do you cuff them
7    immediately?
8  A.  When they are under arrest, yes, sir.
9  Q.  Was she placed under arrested immediately?
10 A.  I can't answer that question, sir.
11 Q.  Because you don't know?
12 A.  I have to look at my report.
13 Q.  You weren't conscious -- you weren't aware of
14   what was going on at that point, were you?
15 A.  Yes, I was.
16 Q.  Did you see her get arrested?
17 A.  By the other officers?
18 Q.  Yes.
19 A.  No, sir.
20 Q.  Did you see her get handcuffed at any time?
21 A.  No, sir.
22 Q.  Did you see her being taken to another police
23   unit and placed in the unit?
24 A.  No, sir.
25 Q.  Did you see the gag bag being placed over her

Page 48

1  head?
2  A.  No, sir.
3  Q.  Did you see any other police officers Mace
4    her?
5  A.  No, sir.
6  Q.  So you didn't see anything that she did or the
7    other officers did after you turned around, saw the
8    police cars coming in the driveway and collapsed?
9  A.  No, sir.
10 Q.  Didn't see anything else?
11 A.  No, sir.
12 Q.  It was at that point that you asked for help?
13   Medical attention?
14 A.  Yes, sir.
15 Q.  Then you went to the hospital in the
16   ambulance?
17 A.  Yes, sir.
18 Q.  That is where they -- they treated you for
19   your exposure to Mace?
20 A.  More of my knees and where I was hurting from
21   falling, my back, my head.
22 Q.  What was your chief complaint?
23 A.  What was my chief complaint?
24 Q.  Yes.  What was the biggest problem you had
25   when you went to the hospital?

Page 49

1  A.  Probably my knees from falling down.
2  Q.  Okay.
3  A.  They were pretty bruised up.
4  Q.  Do you know who -- I assume you don't, but you
5    don't know who put the bag on her; do you?
6  A.  No, sir.
7  Q.  You don't know how many times she was Maced
8    after you had applied Mace to her?
9  A.  No, sir.
10 Q.  Do you know who called for the gag bag, which
11   officer said, "put this on," or is that just an
12   individual decision?
13 A.  No, sir.  I can't.
14 Q.  You can't say?
15 A.  I wasn't -- I can't say.  I was not there for
16   that.
17 Q.  But you do know that she was Maced before the
18   gag bag was placed on her?  Do you know that?
19 A.  I Maced her.
20 Q.  She didn't have the gag bag on at that point,
21   did she?
22 A.  No, sir.
23 Q.  When you say spitting, you didn't see her
24   spitting, did you?
25 A.  I was gone, sir.

Shannon Baum v.
Officer Michelle Ortega, et al.

Michelle Ortega
October 10, 2014

Page 50

1  Q.  You were gone?
2  A.  I was already gone, sir.
3  Q.  Okay.  So you don't know whether the other
4  officers used Mace or not?
5  A.  No, sir.
6  Q.  We have already named -- or you have already
7  named the persons that were.  One of those was Greg
8  Esparza, one was Martin Vigil, then there is the two
9  individuals, Martin Gonzalez and Yvonne Gonzalez that
10  were there?
11  A.  Yes, sir.
12  Q.  Did Yvonne Gonzalez participate in any way
13  that you know of?
14  A.  No.
15       MR. BASHAM:  Participate in what?
16  Q.  (BY MR. MARLOWE)  In separating you from
17  Shannon Baum?
18  A.  No, sir.
19  Q.  Or any of the activities that happened that
20  night?
21  A.  No.
22  Q.  Did you call for help?
23  A.  I couldn't.
24  Q.  I mean, did you call out, "Help me," to Martin
25  or to Yvonne that were there?

Page 51

1  A.  No.
2  Q.  Okay.  How long do you think -- how long do
3  you think it took the backup guys to arrive once this
4  whole thing started?
5  A.  I don't know exactly how long, but the records
6  will show when I called off to speak with her and the
7  minute they arrived.  There will be a record of the
8  time.
9  Q.  When you called --
10  A.  When I told dispatch what I would be doing.
11  Q.  When you told them that you were cleaning your
12  car?
13  A.  Not the cleaning the car part, sir, when I
14  told them I will be speaking to a person that was
15  reported to me possibly intoxicated.
16  Q.  Okay.
17  A.  That was the last response they had gotten
18  from me.
19  Q.  Okay.  How many times do you think she punched
20  you?
21       MR. BASHAM:  Objection, asked and answered.
22  A.  I don't recall, sir.
23  Q.  (By Mr. Marlowe)  Don't recall?
24  A.  No.
25  Q.  You don't recall whether it was with a closed

Page 52

1  fist or not?
2       MR. BASHAM:  Objection, asked and answered.
3  A.  No.
4       MR. MARLOWE:  I don't think I have anything
5  further at this point.
6       MR. BASHAM:  I have one question.  I guess
7  this would be marked as Exhibit A.
8       MR. MARLOWE:  Yes.
9       EXAMINATION
10      BY MR. BASHAM:
11  Q.  This is what plaintiff's counsel has
12  constantly referred to as a gag bag.
13      What do you guys refer to it as?
14  A.  A spit bag.  Like spit, so you won't be spit
15  at.  We don't really call it a gag bag.
16  Q.  As you look at it, there is no cord down at
17  the bottom of it that you can tighten; correct?
18  A.  No, sir.
19  Q.  How many times did Shannon Baum tell you that
20  she was going to "kill you with your own fucking gun,
21  bitch"?
22  A.  I don't recall how many times, but enough for
23  me to not forget.
24  Q.  So it was more than once?
25  A.  Yes, sir.

Page 53

1       MR. BASHAM:  No further questions.
2       EXAMINATION
3       BY MR. MARLOWE:
4  Q.  I have one more question.  When you Maced her,
5  you sprayed it directly into her face?  Isn't that the
6  right way you do it?
7  A.  Sprayed it at her, yes, sir.
8  Q.  So if you were going to Mace me with that,
9  you'd grab it and shoot it right at my face?
10  A.  I will shoot it at your face, yes, sir.
11  Q.  It comes out as a fog but sticks to you; is
12  that right?
13  A.  Yes, sir.
14  Q.  Is there some kind of a chemical property in
15  the fog that causes it to stick to things?
16  A.  I can't answer that question, sir.
17  Q.  They do give you a manual, a Mace manual,
18  don't they, for you to read?
19  A.  Yes, sir.
20  Q.  In that manual, it tells you what it does, how
21  to treat it if you are exposed, that kind of thing?
22  A.  Yes, sir.
23  Q.  Didn't I ask you to give that manual --
24  A.  You did.
25       MR. BASHAM:  Before we leave this deposition

# EXHIBIT B

Shannon Baum v.
Officer Michelle Ortega, et al.

Shannon Baum
September 25, 2014

Page 22

1   peace officer?
2   A.  Yes, it was.
3   Q.  Among other things, correct?
4   A.  Uh-huh.
5   Q.  And was alcohol involved in that arrest?
6   A.  It was.
7   Q.  Were illegal drugs involved in that arrest?
8   A.  They were not.
9   Q.  Were prescription drugs involved in that
10  arrest?
11  A.  No.
12  Q.  And this is the incident that is the basis of
13  this lawsuit, correct?
14  A.  Yes.
15  Q.  Okay.  Let's go to Exhibit Number 3.
16      (Exhibit 3 marked.)
17  Q.  (By Mr. Basham) Okay.  Do you recognize that
18  document?
19  A.  I do.
20  Q.  Okay.  That's the version of the events as
21  you recall it that led up to the incident at issue,
22  correct?
23  A.  Uh-huh.
24  Q.  You have to say "yes" or "no."
25  A.  Oh, yes.  Yes.

Page 23

1   Q.  Okay.  And go through them all because there
2   are several pages to it.
3   A.  Okay.
4   Q.  And I just want you to admit that these are
5   the answers that you gave me to my discovery.  That's
6   the interrogatories.
7   A.  Uh-huh.
8   Q.  Right?
9   A.  (Witness nods head.)
10  Q.  You can't nod.  You have to say "yes" or
11  "no."
12  A.  Yes.  Yes, they are the interrogatories.
13  Q.  Okay.  And then at the very end, there are
14  two pages, and that's also your statement,
15  correct?
16  A.  Yes.
17  Q.  Okay.  And that's one that you provided to
18  your attorney, correct?
19  A.  Yes.
20  Q.  Okay.  On the first page, I have highlighted
21  some stuff, right?
22  A.  Uh-huh.
23  Q.  Yes.  Shannon, you have to say "yes."
24  A.  Yes.
25  Q.  Okay.  You say that you "stopped and had a

Page 24

1   couple of drinks at the Conoco coming down the hill."
2   A.  Yes.
3   Q.  Okay.  Describe that for me.
4   A.  I got off work, I was -- it was any normal
5   day.  I coming down, I was talking to my boyfriend,
6   we got in an argument about, of course, financial
7   stuff, I was a little irritated, stopped at the Conoco,
8   picked me up a couple miniatures, you know, where --
9   actually, it was a half pint bottle of vodka.  That
10  started down the road coming down to Espanola.  That
11  was what happened there.
12  Q.  So as you were driving, you were drinking?
13  A.  Once I got probably to the pueblo, the
14  turnoff, that's when I took my first shot.
15  Q.  Okay.  Did you finish the half pint?
16  A.  No, I didn't finish it until I got to the car
17  wash, I took two shots and then I went straight to the
18  car wash and I stayed there and I finished drinking and
19  washed my car while I sat there and drank.  Took the
20  keys out of my ignition.
21  Q.  Are you aware that two empty pints of vodka
22  were found in your purse?
23  A.  I was aware that there was some found in my
24  car, not in my purse.  They found it in my car.  My
25  purse was emptied out.  They threw everything

Page 25

1   everywhere.  We couldn't even find my purse.
2   Q.  So why didn't you wait to get home to drink?
3   A.  Because I was fighting with my boyfriend.  I
4   didn't want to go home because I thought things would
5   get escalated and it would get worse and turn into
6   something worse.  So that's why I decided to go to the
7   car wash and go mellow out and sit there, and, you
8   know, mellow out, wash my car, vacuum it, clean it, do
9   the whole thing, sit there, wait for some friends to
10  come by, you know.  I wasn't planning on drive.
11  That's why I stopped.  That's why I stopped there, was
12  for the whole purpose that I wouldn't drink and drive.
13  Q.  But you had previously --
14  A.  I took a shot, yes, I took a couple shots,
15  and then drove into the car wash and stayed there.
16  Q.  And finished off the bottle?
17  A.  Yes.
18  Q.  And you testified that you and your boyfriend
19  were arguing over finances, correct?
20  A.  Correct.
21  Q.  Tell me about that.
22  A.  We were just having an argument over, you
23  know, we didn't pay a bill, there were other bills due,
24  I needed to get -- issues that couples have.  Who was
25  going to be picking up the kids today, you know, but

Shannon Baum v.                                    Shannon Baum
Officer Michelle Ortega, et al.              September 25, 2014

---

Page 26

1  it's usually been fights about financial issues.
2  **Q.  Okay.  On the bottom of that first page, I**
3  **have highlighted, "I'm not driving and she forcefully**
4  **grabbed my arm and put a handcuff on my right wrist, I**
5  **jumped to my car's front seat and said 'Fuck this.'**
6  **She jumped on top of me and we fell to the ground."**
7  A.  Uh-huh.
8  **Q.  So you admit that happened?**
9  A.  What?
10  **Q.  You admit that happened?**
11  A.  I admit that happened.
12  **Q.  So you essentially disobeyed an officer?**
13  A.  Essentially, she was harassing me.  That's
14  why I just wanted to leave and did not want to -- I
15  wanted to avoid the confrontation, because, first of
16  all, she coerced me into driving by asking me to move
17  my car when she knew that she had gotten a call that I
18  was drinking there.
19  ___ And she asked me to get in my car and move
20  it.  As soon as I did that, then she proceeded to give
21  me a DWI test, after she had me drive the car, and
22  after that, then she proceeded -- and she didn't give
23  it to me once, she gave it to me three, you know, four
24  times, and wouldn't stop, and then told me I was under
25  arrest.  And, you know, of course, my eyes were red, I

---

Page 27

1  had been crying.  I wasn't drunk.  I had been crying.
2  I was upset.  She then told me I was under arrest; for
3  what, I didn't even know.  I had not even been driving.
4  **Q.  Okay.  So you said that she got a call that**
5  **you had been drinking and driving?**
6  A.  (Witness nods head.)
7  **Q.  Tell me about that.**
8  A.  What I know is she showed up there.  I didn't
9  know that she had been called.  I am in a stall, I am
10  washing my car, she comes in and she says, "Excuse me.
11  Can you please move your car?  I need you to come pull
12  your car over."
13   I said, "All right."  I got in my car and I
14  moved it.  Did I disobey an order, no, I did what she
15  told me.  Then she proceeded to ask me to get out of
16  the car, which I did.  Then she asked if I had been
17  drinking because my eyes were red.  I said, "No."
18  **Q.  But you had been drinking, correct?**
19  A.  I did, I did, I said, "No."  She asked me why
20  my eyes were red.  I told her I was fighting.  Then she
21  asked me to give -- she proceeded to give me the pen
22  test with my eyes.  She did it about three times.  And
23  then she told me she was going to place me under
24  arrest.  When I said, "For what," she told me it was
25  for DWI.  I said, "Well, I am not driving."

---

Page 28

1  **Q.  Okay.**
2  A.  "You had me drive."  You know, I didn't see
3  that as fair.  How could a cop stop you when you're not
4  even driving?  So that's when the whole incident
5  started.
6  **Q.  Okay.  Let's turn to the next page.**
7  A.  Okay.
8  **Q.  So there you say, "I ingested two drinks of**
9  **vodka at around 4:30 on June 7, 2011," correct?**
10  A.  Uh-huh.
11  **Q.  But, in fact, it was more than two drinks of**
12  **vodka, wasn't it?**
13  A.  No.  I ingested two drinks around 4:30, when
14  I got there.  That was before.  When I was there, yes,
15  I drank more, but when I was there -- before I got to
16  the car wash, I drank two drinks while I was driving.
17  **Q.  Okay.  And how much more did you drink when**
18  **you got to the car wash?**
19  A.  I finished off the half pint.
20  **Q.  Okay.  And then let's go to the next page.**
21  **Here you said, "I could feel the liquid**
22  **dripping of my face and hair," and that was the Mace,**
23  **correct?**
24  A.  Correct.
25  **Q.  And how many times would you say you were**

---

Page 29

1  **Maced?**
2  A.  Consistently, probably when they first threw
3  me on the floor, they just kept the nozzle going.  It
4  was just one consistent flow.  And it wouldn't stop.
5  So that was the first time, when they just wouldn't
6  stop, and there was about --
7  **Q.  Okay.  I'm sorry for cutting her off.  I'm**
8  **sorry for cutting you off.**
9  A.  Uh-huh.
10  **Q.  You said it was "continuous."**
11  A.  Yes.
12  **Q.  How long would you say it was?**
13  A.  I'd say about a minute.  They just sprayed me
14  down and I could feel not just one spray, but it was
15  coming from all directions in my face.  It was just
16  coming from all directions.
17  **Q.  Okay.  Be a little bit more specific for me,**
18  **please.**
19  A.  Sure.  As I had my hands up and I was
20  surrendering, they -- I could hear officers coming in
21  and I immediately felt a discharge of liquid coming
22  from all angles into my face, on my arms, on my back,
23  everywhere, and they continued to do this for
24  approximately 45 seconds to 60 seconds.  It just
25  wouldn't stop.  And that was that.  I was yelling to

---

Shannon Baum v.
Officer Michelle Ortega, et al.

Shannon Baum
September 25, 2014

Page 30

1  "Stop" while it was happening and I was with my hands
2  up surrendering.
3  Q.  Were you on the ground or standing?
4  A.  I was on my knees with my arms in the air.
5  Q.  Okay.  Where was Officer Michelle Ortega?
6  A.  She was -- they had already -- she had
7  already been picked up and she was being taken to the
8  ambulance --
9  Q.  Okay.
10  A.  -- is what I recall.
11  Q.  Okay.  Let me step back here a little bit.
12  A.  Sure.
13  Q.  Had you taken any prescription drugs that
14  day?
15  A.  I did not, no.
16  Q.  They found an empty bottle of oxycodone in
17  your purse.
18  A.  Uh-huh.  That was prescribed to me, but it
19  wasn't -- if you read the date, it wouldn't have been
20  in there.  It was an old bottle that was empty.
21  Q.  So why do you keep empty bottles in your
22  purse?
23  A.  I guess I shouldn't keep it.  It wasn't in my
24  purse, it was in the glove box of my car.
25  Q.  And I know you testified earlier you don't do

Page 31

1  illegal drugs.
2      Did you take any illegal drugs that day?
3  A.  I did not.
4  Q.  Now, the police report states that you had
5  done cocaine that day.
6  A.  And I did not.  I don't do -- I didn't do any
7  illegal drugs.
8  Q.  So it's your testimony you didn't tell them
9  that you took cocaine that day?
10  A.  No.
11  Q.  Let me ask you this -- well, let me hold
12  off.  Strike that.
13  A.  Sure.
14  Q.  Let's go to the next page.  You say at this
15  point in time, that officer told you to "Shut up.  You
16  are going down.  You'll never work at the Lab again."
17      And that's in quotations, correct?
18  A.  Uh-huh.
19  Q.  So do you know what officer told you that?
20  A.  I do not.  By that time, I was already
21  sitting in the car, the gag bag was over my face, I was
22  in hysterics, I couldn't breathe, and I could just hear
23  him yelling at me to shut up because I was crying.
24  Q.  How would the officer know that you worked at
25  the Lab?

Page 32

1  A.  My badge.  I had my badge in there that says
2  "Los Alamos National Laboratory."
3  Q.  In where?
4  A.  In my car.  I was coming down from work that
5  day and I had my badge in my car.
6  Q.  So the officer, while he was Macing you, is
7  looking in your car?
8  A.  This was after he had Maced me and this was
9  prior -- after he had Maced me, and I don't know if it
10  was this officer.  There were three or four officers
11  there.  I don't know which one it was.  All I know is
12  the one that was sitting inside the car with me told me
13  that I would never work at the Lab again.
14      Whether it was the one that Maced me or if he
15  was with the ones that Maced me, because it was not
16  just one that Maced me, it was all of them.  I mean,
17  they all emptied their cans of Mace on me, but, you
18  know, it was -- he told me that, specifically, because
19  I remember hearing that as I had the bag over my head
20  and I was being transported.
21  Q.  Would you admit that mixing cocaine,
22  oxycodone, and alcohol is dangerous?
23  A.  Oh, yes.
24  Q.  Do you believe a person could get wasted by
25  mixing those three?

Page 33

1  A.  Yes, I do.
2  Q.  Okay.  Do you agree, by mixing those three,
3  that someone might not be in either her or his right
4  mind?
5  A.  Correct.  And I would never mix them because
6  I have had people close to me that have died from
7  overdoses and stuff like that.  And the bottle that I
8  had was for a prescription for myself from a dental
9  procedure that I had.
10      That's why I had the bottle.  Whether I had
11  it there, there was none in there.  It was an empty
12  bottle.  And it was -- if you look at the date, it was
13  back in March, is when the date was on that bottle.  It
14  was just that I left it in there.
15  Q.  Now, if someone mixed those three, would you
16  agree that they might black out?
17  A.  Yes.
18  Q.  Have you ever blacked out?
19  A.  I have, but not from those three.  I have
20  blacked out from drinking alcohol.
21  Q.  Okay.  Now, in here, going back to page three
22  or four of Exhibit Number 3, you claim that you -- that
23  they made you get naked?
24  A.  Yes.
25  Q.  Tell us about that.

Shannon Baum v.
Officer Michelle Ortega, et al.

Shannon Baum
September 25, 2014

Page 34

1  A.  Okay.  So after they put the bag on my head
2  and we got to the police station, they took me in, they
3  immediately took me into the doors where it was -- kind
4  of like my vision was blurry at the time.  They took
5  the gag bag off when I got into, like, a garage area,
6  it looked like, okay, it was kind of a big garage
7  place.
8      They took the bag off my head.  I knew it was
9  big because it echoed.  When they took off the gag bag,
10  then I asked them if I could please rinse my face
11  because I was in pain, I was burning, I couldn't
12  breathe, I was choking and coughing, and I kept asking
13  them over and over, "Can I rinse my face, put water on
14  my face?"
15      And the officer told me to take off my
16  clothes.  He said, "You need to take off your
17  clothes."  And he ordered me to.  So I did.  I was
18  taking them off slowly, you know, I wasn't -- I was
19  kind of hesitant to do this.
20      So I am taking them off.  There were a couple
21  of them that started -- I felt one start pulling my
22  shirt and hurrying me up, the other was pulling my
23  legs.  They hurried me up to take my clothes off,
24  stripped me down, completely down, and pushed me inside
25  a shower, a warm shower, where as soon as I hit the

Page 35

1  shower, I started screaming because it felt like
2  someone threw me in a fire, like they lit my skin on
3  fire.  It was just an immediate reaction.
4      And I just started screaming to no end and I
5  could hear them laughing and poking fun and just being
6  -- just being mean.  And Mr. Avado, David Avado, which
7  I didn't know his name at the time, he was a security
8  guard there, came in and he held up a towel and he told
9  them to stop and to leave me alone.
10      And he looked at me and he said, "I'm
11  sorry."  He said, "They shouldn't be doing this.  I
12  don't know why they are doing this to you."  And he put
13  a towel up on the shower so that they wouldn't be
14  laughing and joking.  And I asked them to stop again.
15  And then from there, he took me -- he wrapped me in the
16  towel and he handed me a jumpsuit and he told me to put
17  it on.
18  Q.  Okay.  Now, turn to the next page.
19      And we are still on your statement, correct?
20  A.  Uh-huh.
21  Q.  And you say, "The next day, I was transported
22  to Santa Fe Jail."
23  A.  Correct.
24  Q.  Okay.  And at the bottom, it says, "After the
25  initial two day, I tried to rinse myself off and right

Page 36

1  away started to burn.  It wasn't until four days that I
2  could stand for a few seconds in the shower," correct?
3  A.  Correct.
4  Q.  And down towards the bottom, you say, "It has
5  been almost three years, and to this day, if I see an
6  officer of the law, or, for that matter, even a
7  security guard, I have severe anxiety, I start to get
8  sick, I can't stop my body from feeling like I'm
9  jumping out of my skin because I feel so angry and
10  scared inside."
11  A.  Correct.
12  Q.  Okay.  And then the next page, it says, "Upon
13  transportation to Espanola Jail, I was denied medical
14  attention when, in fact, I was in severe need."
15  A.  Correct.
16  Q.  Okay.  Let's go to the next page.
17      And this is the statement that you provided
18  to your attorney, correct?
19  A.  Correct.
20  Q.  And it says, "I tried to get into my car and
21  by this time, she was on top of me in the driver seat
22  of my car."
23      Do you agree with that statement?
24  A.  I'm sorry, where are we?
25  Q.  Where I highlighted.

Page 37

1  A.  Okay.  Yes.  So I didn't try, which is my
2  mistake.  I got into my car.  I actually sat in my car
3  when she actually jumped on top of me.
4  Q.  Okay.  But you said "Fuck this" and jumped
5  into your car and tried to turn on the ignition,
6  correct?
7  A.  I did, yes.
8  Q.  Okay.  So that's resisting an officer,
9  correct?
10  A.  Correct.
11  Q.  And then the next highlight is going back to
12  the Mace.
13  A.  Uh-huh.
14  Q.  You say, "I could feel the liquid dripping
15  from my hair and face," correct?
16  A.  Yes.
17  Q.  So you testified earlier it was coming from
18  all angles from a variety of different officers,
19  correct?
20  A.  Uh-huh.
21  Q.  And so it was just dripping off you?
22  A.  Yes.
23  Q.  Okay.  That's your testimony?
24  A.  It was dripping, yes.  It was -- when I was
25  standing up against the cop car after they had drug and

Shannon Baum v.
Officer Michelle Ortega, et al.

Shannon Baum
September 25, 2014

Page 46

1 Q.  Okay.
2 A.  That would probably be on the low end.
3 Q.  And under "Patient History," it says,
4    "Alcohol, infrequent, social use only."
5 A.  Uh-huh.
6 Q.  You stand by that statement?
7 A.  Yes.
8 Q.  That you infrequently use alcohol?
9 A.  I am not an every day alcohol user.  Do I do
10 it on weekends, sometimes, yes, but I don't use alcohol
11 every day.
12 Q.  And how many DWI arrests have you had?
13 A.  Three in the last -- in my 30s.  I never,
14 ever before my 30s got arrested, but yes, in my 30s, I
15 was having some kind of a hardship, I was going through
16 some things, and if you look at my arrest records, it's
17 all in three years, and I never, ever got in trouble
18 before that.
19    Was I going through some kind of crisis, or,
20 you know, thing, yes, I was.  I was having -- I was
21 having a life -- I don't know what you want to call it,
22 but during my 30s, from about 31 until about, you know,
23 36, yes, I went off the deep end.  I don't know what
24 happened.  I don't know why I did what I did.
25    All I know is that you know, I was drinking

Page 47

1 more, I was feeling that my life had been all about
2 raising kids, going to school, and I never got to do
3 anything I wanted to do, I never got to go out with my
4 friends.  Yes, I went on kind of a binge, a crazy
5 thing, I did get a little crazy.
6    And I did -- I just felt that I had not
7 gotten to experience anything.  I had been with my
8 boyfriend since I was 17.  Did I do -- get a little
9 crazy, yes, I did.  I don't know why or what I did and
10 what I was thinking, but, you know.
11 Q.  So crazy?
12 A.  Yes, I did.  What I mean by "crazy" is being
13 arrested.  I mean, that's not me.  I never got arrested
14 until I was, what, 32, and I got arrested between --
15 like from age 32 to 36, all in those years.  I just
16 kind of went, you know, in this weird spiral down, you
17 know.
18    I did my job, I raised -- I was raising my
19 children, I was going to school, I was working, and
20 yes, I felt that maybe I needed -- it was time for
21 myself.  And I wanted to get out there and see and go
22 have fun with my friends, go do this and that, and it
23 was a bad decision that I made in my life.  Have I done
24 that since that incident in 2011, no, I have not been
25 in trouble since.  I have not gotten in trouble.  I

Page 48

1 don't drive at all hardly, you know, I don't even
2 drink.  I have not drank since then.
3 Q.  So you were going through a rough patch?
4 A.  Yes.
5 Q.  You were being crazy?
6 A.  I was.
7 Q.  And crazy enough to try and kill a female
8 police officer with her own gun?
9 A.  No, no, never would I do that.  Never.  Never
10 would I do that.  I would never try to kill any human
11 being with their own gun, and especially a cop with
12 their own gun.  Did we get into a scuffle and did she
13 -- was she harassing me, yes; did we fight, yes, but,
14 you know, I paid for that.
15    I went and I did my aggravated.  I got in
16 trouble for DWI.  You know, the point of the matter was
17 that I was handcuffed, I was subdued, they beat me, and
18 they put me in the showers.  I mean, I did -- I got in
19 trouble, yes, and I did my thing.  I still, you know,
20 to this day, have had to answer to what I did, but did
21 that give them the right to do what they did to me and
22 not have to answer for it?
23 Q.  Okay.  Now, you claim you were denied medical
24 attention at the Espanola Detention Center, correct?
25 A.  Yes.

Page 49

1 Q.  I want to turn you to Exhibit Number 6.
2    (Exhibit 6 marked.)
3    THE WITNESS: Exhibit Number 6?
4 Q.  (By Mr. Basham)  This one right here.  This
5 is Exhibit 6.
6 A.  Yes.
7 Q.  Is that your signature?  Simple question.
8 A.  Yes, it does look like my signature, yes.
9 Q.  Okay.  And this is a Memorandum.
10 A.  Uh-huh.
11 Q.  It's from the Espanola Detention Center.  And
12 the subject is "Refusal of Medical Attention."  And it
13 says, "I, Shannon Baum, DOB, 11/22/76, am refusing
14 medical attention from the Espanola Police
15 Department."
16    So you claim that they were denying you
17 medical attention, correct?
18 A.  I claim that I was asking to see -- I was.  I
19 was asked -- I was telling them, "I am in pain.  I am
20 hurting."  Did I want the Espanola Police Department --
21 anything further from them, no.  I was hurt.
22 Q.  So you deny --
23 A.  I just didn't want nothing from these
24 officers.  I didn't want nothing from anybody at that
25 place, you know.  I would have just been -- I'm sorry.

Shannon Baum v.                                                    Shannon Baum
Officer Michelle Ortega, et al.                                   September 25, 2014

Page 50

1  Q.  So they offered you medical attention and you
2      denied it, correct?
3  A.  I guess I did.  I don't remember, but I guess
4      I did.
5  Q.  Okay.
6  A.  According to this statement, I did.
7  Q.  With your signature, correct?
8  A.  Yes.
9  Q.  Let's go to the second-to-the-last document.
10     Let me get this for you here.  No, it's not the
11     second.  It's the third-to-the-last document in my pile
12     of exhibits.
13 A.  This one?
14 Q.  This one right here.
15 A.  Okay.
16     (Exhibit 7 marked.)
17 Q.  (By Mr. Basham)  Okay.  So you testified you
18     couldn't take showers for four days, correct?
19 A.  When I went in, I tried to, I tried to take
20     the shower, but I couldn't.  I came out of there just
21     burning and set on fire again.  It was like I
22     reactivated everything all over again.  The whole Mace
23     reactivated on me.
24 Q.  Okay.
25 A.  And I was in pain again, but yes, I did try.

Page 51

1      I was trying to wash the Mace out of my hair because I
2      had other inmates complaining to me.  I couldn't sit by
3      anyone, I couldn't get near anyone, nobody could stand
4      to be near me because all they would do is start
5      coughing excessively because I smelled so bad of Mace,
6      and I was just -- it was horrendous.
7  Q.  Okay.  But I believe your prior testimony was
8      that you couldn't take a shower for at least four
9      days.
10 A.  Yes.
11 Q.  Okay.  But, in fact, you did take a shower on
12     the same date that you were arrested, correct?
13 A.  The shower where they undressed me and threw
14     me in there forcibly?
15 Q.  No.
16 A.  Okay.
17 Q.  Let's go over this document here.
18 A.  Sure.
19 Q.  If you look at the little symbol there, it
20     says, "County of Santa Fe, State of New Mexico."
21 A.  Right.
22 Q.  So this is from the Santa Fe County Detention
23     Facility.
24 A.  Uh-huh.
25 Q.  Okay?

Page 52

1  A.  Uh-huh.
2  Q.  And it says, "Inmate's Name:  Shannon Baum."
3      Do you agree with that?
4  A.  I do.
5  Q.  And then it has a number I guess they gave
6      you, correct?
7  A.  Okay.
8  Q.  It says, "Did inmate receive a phone call,"
9      and it's checked "yes"?
10 A.  Okay.
11 Q.  And it says, "Time offered:  10:30 p.m."
12 A.  Uh-huh.
13 Q.  Okay.  And then it says, "Did inmate receive
14     a shower," okay?
15 A.  Uh-huh.
16 Q.  And it's marked "yes."
17 A.  Uh-huh.
18 Q.  So that means you took a shower on that day.
19 A.  I tried to take a shower.  I couldn't.  I
20     couldn't take a shower.  If anybody knows about Mace,
21     or if you know about Mace, you put your arm inside
22     water and it sets you on fire.  Did I want to try to
23     take a shower, yes, yes.  Believe me, yes, I would have
24     said, "Yes, I want to take a shower."  Could I actually
25     get in a shower, no.  I couldn't get in the shower.

Page 53

1  Q.  So your testimony is that they marked this
2      wrong?
3  A.  My testimony is yes, they probably asked me
4      if I wanted a shower and I said yes to try.  I did try
5      to take a shower.  Did I actually get in the shower,
6      did they actually see me get in the shower, no.  No,
7      because the next day, when that lady had told me not to
8      take the shower, when I did receive medical attention,
9      that's when I became aware that you are not supposed to
10     get into water because it causes a reaction.
11     That's why I was in so much pain every time I
12     tried to take a shower.  Did I want to get the Mace
13     off, yes.  As a person, I would think a shower would
14     help because it would take off the Mace.  Was I going
15     to refuse a shower, heck, no.  I wanted to get the Mace
16     off.  Of course, I'm going to try to get in the shower,
17     but I couldn't.
18 Q.  It says, "Did inmate receive a shower?"
19 A.  Uh-huh.
20 Q.  And it's marked "yes," correct?
21 A.  Yes.
22 Q.  At 10:30, correct?
23 A.  Yes.
24 Q.  And it was also your prior testimony that you
25     were transported to Santa Fe County Detention Center

Shannon Baum v.
Officer Michelle Ortega, et al.

Shannon Baum
September 25, 2014

---

Page 66

1  Buffalo Thunder was not there. And we were there,
2  yes. It was probably in, like, 2009, and what happened
3  was we were having a good time and this girl decided
4  just to start bad-mouthing, you know, and she wasn't
5  bad-mouthing me, actually.
6      So she started bad-mouthing my husband and
7  then started telling me and she was just being really,
8  really rude. And I asked her to stop and then we got
9  into it in the bathroom. That's where we got into it,
10 was inside the bathroom.
11 Q. (By Mr. Basham) Okay. And you just told
12 me --
13 A. And that's the one that I got arrested for,
14 because I was thinking about it. I was in the
15 bathroom, we went on break, and that's the one that I
16 think that I was missing on the assault. That came up,
17 that you had asked me if I remembered. That's the one
18 that happened.
19 Q. Okay.
20 A. That's the only one. I'm sorry to, you know,
21 bring this up now, but that was the one that -- the
22 only one that I can remember that got dismissed, you
23 know, because I saw on there that it was dismissed.
24 She never filed charges, but did I hit her, yes, I
25 did. We were in the bathroom and things escalated.

---

Page 67

1  Q. So just to be clear, previously you testified
2  that you didn't know or you couldn't remember why you
3  were arrested for battery.
4  A. Right, I did.
5  Q. Now, you are telling us that, in fact, you
6  were arrested for a fight at Cities of gold in the
7  bathroom?
8  A. Yes. Yes, I am. I couldn't -- I didn't
9  recall. I was sitting here thinking. We went on break
10 and everything and I started to remember as we were
11 going through this, but at the time when you asked me
12 it, and you asked me to remember that far back, I
13 didn't remember.
14     As we were going through, yes, I started to
15 remember. I am starting -- you know, I'm trying to
16 remember everything that happened. Do I remember that
17 night, you know, now that you presented it
18 to me, yes, I remember why.
19     You know, the reason I said I don't remember
20 going is because I never went to court on it, nothing
21 ever became of it, it got dismissed, and they dropped
22 the charges. So, I mean, they took me in to the police
23 station, they took my, you know, fingerprints, but then
24 they released me. And they released me to Jeff and
25 nothing ever came of it. I never had to go to court on

---

Page 68

1  it or anything like that. So, you know, to my
2  knowledge, I just figured that kind of I didn't get
3  charged with it.
4  Q. Okay. But you were arrested, correct?
5  A. Yes, I was. That was one of the nights that
6  I just didn't recall.
7  Q. Okay. Did she hit you?
8  A. Yes, she did.
9  Q. Where?
10 A. She punched me a couple times in the face,
11 but I guess you could say I got arrested because I got
12 the better end of it.
13 Q. And you were getting the best of Officer
14 Ortega, too, weren't you?
15 A. Actually, I was just holding her in a bear
16 hug. I never once hit her with a closed fist. I never
17 hit her hard ever. I held her in a bear hug the whole
18 time, never raised my fists to her, never hit her.
19 And, I mean, that could have been said by just looking
20 at my fists.
21 And the nurse that was there, you know, she
22 told me that when she asked me what happened. She
23 said, "Well, your wrists aren't messed up. So you can
24 tell you didn't hit her with a closed fist. So what
25 are the charges?" And I told her.

---

Page 69

1      But I know for a fact that I did not strike
2  that officer. All I did was hold her with a bear hug.
3  That's all I did. And why did I hold her, because yes,
4  I had been drinking, I had been emotional, I was out of
5  my mind, being stupid.
6      It was all -- when you get into something
7  like that, you are not thinking. I wasn't thinking. I
8  was just trying to hold her so she couldn't arrest me
9  or so she couldn't hit me. So my thinking was just
10 hold her, you know, and that's all I did, is I put my
11 arms around her and I held her as tight as I could.
12 Q. But you admit you were being crazy, correct?
13 A. I admit I wasn't in my right mind.
14 Q. Okay. Let's go to this next exhibit.
15 A. Okay.
16     (Exhibit 10 marked.)
17 Q. (By Mr. Basham) And this is an Order Setting
18 Conditions of Release.
19     Okay. Do you recognize this exhibit?
20 A. Okay. This is on June 11th -- I mean, June
21 29th, 2011. So I am guessing this is something when I
22 got out of jail, right?
23 Q. That's your signature, right?
24 A. Yes, that's my signature, but what this is, I
25 am not sure. Oh, Conditions of Release. Okay. I

---

Shannon Baum v.
Officer Michelle Ortega, et al.

Shannon Baum
September 25, 2014

Page 70

1  see. Conditions of Release, yes.
2  Q. And it's signed by George Anaya, Junior,
3  correct?
4  A. Okay.
5  Q. Let me ask you this, how long were you in
6  jail after your arrest for this incident?
7  A. Twenty days. It was around 20 days, 19 days,
8  18 days, because I went in on, what, June 7th, and I
9  didn't get out until here, until this time, because it
10 was right before my son's birthday, I remember.
11 Q. So why didn't you bond out earlier?
12 A. Why didn't I bond out earlier?
13 Q. Uh-huh.
14 A. Because the Judge wouldn't let me. The Judge
15 said that I had beat Michelle Ortega up and put her in
16 the hospital. And I couldn't understand where they got
17 that information because I never even hit the girl. I
18 never even struck her.
19    And so I was in awe, thinking, "Why is she in
20 the hospital when all I did was bear hug the girl?"
21 That's was my whole thing. I couldn't understand why she
22 was in the hospital for things when I was the one that
23 got my butt whipped. Sorry.
24 Q. So, I mean, judges always set bonds.
25 A. Right. And he put mine at 100,000, like if I

Page 71

1  murdered someone, you know, which I thought was insane,
2  because I didn't even much less punch the girl or hit
3  her. The only thing I was trying to do was keep her
4  from hitting me and holding her, you know.
5    And so I couldn't understand the gist of it
6  or what was going on. All I knew is that, you know, I
7  had not gotten to say my side to anybody and they just
8  basically said, "You are staying in there for this much
9  because she is in the hospital." For what, I don't
10 know.
11 Q. Going back to the incident, did anyone pull
12 you off of Officer Ortega?
13 A. No, nobody pulled me off of Officer Ortega.
14 Nobody did. I was behind her. I was holding her in a
15 bear hug the whole time. The reason that I let go was
16 because I heard sirens coming and I heard footsteps
17 running towards me and they were screaming at me to let
18 go.
19    That's when I lifted my arms and I said,
20 "Okay. Okay." That's when I started getting sprayed
21 continuously with Mace, and they wouldn't stop. But
22 did anybody try to pull me off or anything, no. There
23 was nobody -- nobody touched me, unless, like, I am
24 super strong and I didn't feel anything, because I was
25 in a bear hug, had her held until the other officers

Page 72

1  arrived, and I let go.
2    That's when I let go, was as soon as I heard
3  the cop cars drive up and all the -- and that's what I
4  heard, is I heard all the yelling and I heard shoes
5  running. I remember the noise of the shoes running
6  towards me.
7  Q. And you weren't Maced at that point in time?
8  A. I had not been Maced at that point in time
9  until I heard them and I lifted my arms and I said,
10 "Okay. Okay." And that's when I got Maced. That's
11 when I started getting Maced.
12 Q. And on this document, Order Setting
13 Conditions of Release, I have something highlighted
14 there.
15 A. Uh-huh.
16 Q. It says "Finding."
17 A. Uh-huh.
18 Q. "Second violent offense against law
19 enforcement in four weeks."
20 A. Uh-huh.
21 Q. Okay. So we know you had the issue with
22 Officer Ortega.
23 A. Uh-huh.
24 Q. What's the other?
25 A. I have no idea. You tell me, because I have

Page 73

1  no idea who the other officer is that supposedly was
2  violent with.
3  Q. This was during your crazy period of time,
4  right?
5  A. This was during the period of time that I was
6  kind of -- yes, that I was not -- that I wanted to be
7  out with friends and I was tired of being the Sally
8  homemaker.
9  Q. Where you were not in your right mind,
10 correct?
11 A. I was in my right mind. I wasn't out of my
12 mind every single day. Did I go and have a drink once
13 in awhile, yes. Does it impair your judgment, yes.
14 That's what I am conceding to, is my judgment was
15 impaired.
16    By being "crazy," I mean, my judgment was
17 impaired. It's not that I am looney or that I belong
18 inside a mental house. It's just that yes, my judgment
19 was impaired. Was I impaired every single day, no,
20 no. I worked. I have kids.
21    Did I fall off the wagon and go sometimes a
22 little bit off, yes, I did, but I didn't -- you know,
23 this one, for the violence on the officer, I couldn't
24 tell you who I was violent with four weeks before. I
25 mean, there is no arrest record of me being violent

# EXHIBIT C

Shannon Baum v.
Officer Michelle Ortega

Greg Esparza
October 10, 2014

---

Page 10

1  Q.  Did you hear that call?  Is that how you know
2  that?
3  A.  Yes.  Yes.
4  Q.  Okay.
5  A.  She advised dispatch that she was okay, but
6  she did sound to be very winded and exhausted.
7  Q.  That is what they told you; right?
8  A.  No, sir.  That is what I heard, sir.
9  Q.  That is what you heard as you were listening
10  to the dispatch --
11  A.  Radio, yes.
12      MR. BASHAM: One at a time.
13  Q.  Sounded winded, you said?
14  A.  Winded and exhausted.
15  Q.  Go ahead.  So you continue -- where were you
16  or how far away were you when you heard Michelle
17  dispatch -- call dispatch to say she was okay?
18  A.  I was just around the corner, the street --
19  like I said, we were approaching La Joya Street, which
20  isn't very far.
21  Q.  Was there anything else in that dispatch
22  message from Michelle to dispatch regarding her actions
23  or the actions of the defendant?
24  A.  I don't recall.
25  Q.  You don't recall.  Was there more said even

---

Page 11

1  though you don't recall what was said?
2  A.  I don't recall, sir.
3  Q.  Okay.  So how soon did you arrive at the car
4  wash?
5  A.  We just -- moments later, seconds.
6  Q.  Seconds?
7  A.  Seconds later.
8  Q.  When you arrived on the scene, what did you
9  see?
10  A.  Well, actually, we arrived -- Officer Martin
11  Vigil was directly in front of my patrol unit.  We
12  arrive together.  He arrived on the scene directly near
13  where Officer Ortega was standing, and I pulled in right
14  behind him.  It is right next to the main office of the
15  car wash.
16  Q.  Was she standing when you got there?
17  A.  Yes.
18  Q.  When you came into the driveway, you were
19  right -- right on Officer Vigil, I would assume?  I
20  mean, you were right one after the other?
21  A.  Yes, that is correct.
22  Q.  You say she was standing.  I would assume that
23  she was standing when he came in as well?
24  A.  I can't say what he saw.
25  Q.  Okay.

---

Page 12

1  A.  I can only tell you what I saw.
2  Q.  You saw she was standing as you drove into the
3  parking lot?
4  A.  Yes.
5  Q.  Where was she standing?
6  A.  She was standing -- there is the main office,
7  and then there is three bays where there is vacuums and
8  you can dry your car and stuff.  She was standing, I
9  believe, right near the second bay.
10  Q.  Okay, and where was Shannon Baum?
11  A.  She was right next to the -- right next to the
12  third bay, right in between the third and second bay.
13  She was right in front.
14  Q.  Was she standing?  Laying down?  Kneeling?
15      MR. BASHAM: Objection as to form.
16  Q.  (By Mr. Marlowe) When you saw her, what
17  position was she in?
18  A.  She was actually on the ground.  She was
19  seated.  She was not on her butt, but she was actually
20  on her hip, on her right hip on the floor, and she had
21  both her arms -- her hands out in front of her on the
22  ground, and she was yelling and screaming.
23  Q.  What was she yelling?
24  A.  I don't recall exactly what it was.  Let me
25  see here.  I will refer to my report here.  She was

---

Page 13

1  yelling that her eyes and her face were burning.
2  Q.  Do you know why that would be?
3  A.  Well, I went to -- Officer Vigil went to
4  secure Ms. Shannon Baum, and I went over to Officer
5  Ortega to check on her and see if she was okay.
6  Q.  Okay, and what did you find out from checking
7  on Officer Ortega?
8  A.  She said she was -- she was okay.  From what I
9  saw on her, it looked like she had been in a fight.  Her
10  hair was pulled out, her face was red, her uniform was
11  pulled out.  It was soiled.  It was clear she looked
12  like she had been in a fight.
13  Q.  Was she upset, or was she calm?
14  A.  She was hysterical.  She was trying to catch
15  her breath and stuff.
16  Q.  Did you ever administer Mace to Shannon Baum
17  at any time that night?
18  A.  No.
19  Q.  Did Officer Vigil ever administer Mace?
20  A.  No.
21  Q.  Did you ever put a gag bag -- or what do they
22  call it -- spit bag -- did you ever put a spit bag on
23  Shannon Baum?
24  A.  I put a spit hood on her, yes, I did.
25  Q.  What was the location of that?

---

Shannon Baum v.
Officer Michelle Ortega

Greg Esparza
October 10, 2014

Page 18

1 Q. **Complaining about being Maced?**
2 A. Well, that was part of it, but she was just
3 yelling and screaming and yelling derogatories toward
4 myself and the other officers, cussing, swearing.
5 Q. **Okay. Have you ever been disciplined by the**
6 **Police Department for excessive force or anything like**
7 **that?**
8 A. No.
9 Q. **Did you ever hear any conversation between**
10 **Officer Vigil and Shannon Baum?**
11 A. No, I do not believe that there was any
12 conversation. We were both there together the entire
13 time.
14 Q. **What about between you and Shannon Baum?**
15 A. Did I witness any conversation?
16 Q. **No. Did you ever say anything to her, or did**
17 **she ever say anything to you?**
18 A. I was trying to answer, but you answered two
19 different questions.
20 Q. **Sorry.**
21 A. Which one do you want me to answer?
22 Q. **Did you ever say anything to her?**
23 A. You are kind of running into me.
24 Q. **Did you ever say anything to her?**
25 A. Several things. I asked her several

Page 19

1 questions.
2 Q. **What did you ask her?**
3 A. I don't recall. I asked her if she was okay,
4 asked her if she was hurt, medics went over there, asked
5 her if she was okay, different stuff like that.
6 Q. **Okay, and did she respond?**
7 A. Yeah. She said she was not injured. She was
8 just complaining of the Mace.
9 Q. **You are saying that you walked her to the car,**
10 **meaning you helped her stand up?**
11 A. Yes.
12 Q. **And walked her to the back seat of your car?**
13 A. Yes.
14 Q. **Okay, and then you put the spit bag on her?**
15 A. No, not immediately, no, sir. No.
16 Q. **Was she ever Maced again?**
17 A. No.
18 Q. **Nobody ever Maced her again?**
19 A. Sir, I already answered that question, sir.
20 Q. **Who Maced her the first time?**
21 A. Officer Talache -- I'm sorry, Officer Ortega.
22 Q. **Have you had training in the use of Mace?**
23 A. Yes.
24 Q. **Was that separate from your regular basic**
25 **training?**

Page 20

1 A. No. It was part of the Academy training.
2 Q. **Part of the Academy training, okay.**
3 I note you are using your police report there
4 to refresh your recollection, I assume?
5 A. Yes.
6 Q. **Can we attach that as an exhibit?**
7 MR. BASHAM: Sure.
8 MR. MARLOWE: This will be Exhibit 1 to this
9 deposition.
10 (Exhibit 1 marked.)
11 Q. (BY MR. MARLOWE) Why did you place a spit bag
12 on her?
13 A. After I placed her in the back of my patrol
14 unit -- the reason I placed her and didn't leave her
15 sitting in front was she was continuing yelling and
16 cursing, and she attempted to get up and what appeared
17 to be attempt to flee a couple times, then I sat her
18 back down, and then when she did it another time, that
19 is when I walked over to my patrol unit and put her in
20 the back of my patrol unit and seatbelted her.
21 When she was in the back of my patrol unit,
22 she was continuing yelling, swearing, cursing, then
23 started to spit on the back partition and back windows
24 of the vehicle, so that is when I went, and I removed
25 the spit bag from my trunk -- the spit hood from my

Page 21

1 trunk and placed it on her.
2 Q. **Okay, and what we have here -- this has been**
3 **marked as an exhibit in Michelle's deposition. Is this**
4 **the bag or the type of bag that you used?**
5 A. It is the same type. It is not the same one,
6 but it is the same type.
7 Q. **But it is the same type with the netting and**
8 **just everything that you see here?**
9 A. Yes.
10 Q. **Okay. Then how long were you on the scene?**
11 A. Oh, I don't know, several minutes.
12 Q. **Okay, and I am not sure I understood your**
13 **answer when you said she started to flee.**
14 Was that before -- was that while she was
15 **handcuffed?**
16 A. Yes.
17 Q. **When you say she started to flee, do you mean**
18 **that she got up?**
19 A. Yeah, she was getting up from the seated
20 position. It looked like she was attempting to flee, so
21 that is when I sat her back down. After she did it I
22 believe a third time, that is when I went and put her in
23 the back of my patrol unit.
24 After that is when I was attempting to get
25 some more information from the incident from Officer

Shannon Baum v.
Officer Michelle Ortega

Greg Esparza
October 10, 2014

---

Page 22

1  Ortega, and that is when she started spitting and
2  yelling and hollering, stuff like that, she was spitting
3  all over the windows in the back of the partition, so
4  that is when I proceeded back to my patrol unit, placed
5  the spit hood on her, and then I transported her to the
6  Espanola jail.
7  Q.  Okay.  When did the ambulance come to take
8  Michelle away?
9  A.  They were there shortly after.
10 Q.  They were there the whole time?
11 A.  They were there shortly after we arrived, sir.
12 Q.  Do you know if Michelle Ortega was present
13 when you finished the handcuffing and put her in the
14 car?
15 A.  Yeah, she was there.
16 Q.  She was there?
17 A.  She was there when we handcuffed her.  She was
18 actually -- I believe she was seated in her patrol unit,
19 I think it was -- I am not sure, but she was seated in a
20 vehicle while we were -- while I had placed Shannon in
21 the back of my patrol unit.  She was actually seated in
22 the vehicle, and she was getting medical attention.
23 Q.  She didn't participate in the actual final
24 cuffing and placing in the car?
25 A.  No.

---

Page 23

1  Q.  Anything like that?
2  A.  No.
3  Q.  What did you do after you arrested Shannon?
4  A.  I am not sure what you are asking.
5  Q.  After you arrested the defendant, the
6  individual that was there, what did you do after you
7  arrested her or after -- let me rephrase that.
8  A.  Okay.
9  Q.  After you placed her in the back of the car --
10 A.  Okay.
11 Q.  -- where did you go after that?
12 A.  That is just what I had just explained to you.
13    MR. BASHAM:  Explain that again.
14 A.  After I placed her in the back of the car was
15 when I attempted to get more information from Officer
16 Ortega, so I was speaking to Officer Ortega when Shannon
17 was still in the back of my unit.  She was still yelling
18 and hollering, and that is when she started to spit on
19 the back partition and back windows of the vehicle.
20 Q.  Okay.  What did Officer Ortega do -- what did
21 Officer Ortega say?
22 A.  That is when I was attempting to get a
23 statement from her.  That is when she was telling me
24 that she was -- she was still trying to get -- get calm
25 and stuff from the incident.  She was telling me that

---

Page 24

1  she had -- that she was trying to get her gun, that she
2  said that she was going to kill her with her own gun.  I
3  was trying to get bits and pieces as the medics were
4  talking to her, but that is something that she had told
5  me immediately when I had got on scene and I was
6  checking if she was okay.  That is when she told me,
7  "She was trying to get my gun.  Said she was going to
8  kill me with my gun."
9  Q.  Did you notice any injuries to Michelle?
10 A.  Yes, sir.  She had injuries to her knees,
11 hair, she had scratches.
12 Q.  Scratches to her face?
13 A.  To her face, her hands.
14 Q.  Okay.
15 A.  And I know she had abrasions to both her
16 knees, because when they were -- when they were -- when
17 I was speaking to her, they were tending to her, and she
18 had her pants rolled up, and I could see that her knees
19 were scraped up.
20 Q.  Okay.  Anything else that she said that you
21 can remember?
22 A.  There was several things that she said, but I
23 can't remember everything that she said offhand.
24 Q.  Did you have your lapel cameras working?
25 A.  We didn't have lapel cameras, sir.

---

Page 25

1  Q.  Did you have your belt tapes working?
2  A.  No.
3  Q.  Did not have them on?
4  A.  No.
5  Q.  Is that permitted under your SOPs, or are you
6  supposed to have them on?
7  A.  I didn't have one at that time, sir.
8  Q.  You didn't have one?
9  A.  I had an in-car camera, but my in-car camera
10 didn't work.
11 Q.  Okay, and you were outfitted, I assume, much
12 the same as Michelle was?  You had your gun, your
13 bulletproof vest, your Taser, your Mace, your handcuffs.
14    Did you have a baton?
15 A.  Yes.
16 Q.  A collapsible one that you wear on your belt?
17 A.  Yes.
18 Q.  Anything else that I am missing?
19 A.  Belt keepers, extra magazines, just the normal
20 duty -- duty stuff.
21 Q.  Okay, and after -- how long were you on the
22 scene with her in the back of the car?
23 A.  She was only in the back of the car for a few
24 minutes, maybe about -- I don't know, I am going to say
25 maybe about ten minutes she was back there.

---

Shannon Baum v.
Officer Michelle Ortega

Greg Esparza
October 10, 2014

---

Page 26

1 Q.  Okay.  Then where did you go after that?
2 A.  After that, I transported her directly to the
3  jail.
4 Q.  To the Espanola city jail?
5 A.  Yes.
6 Q.  Over on Onate?
7 A.  No.  On Industrial Park Road.
8 Q.  On Industrial Park Road?
9 A.  Yes, sir.
10     MR. MARLOWE: I guess that is the new jail.
11     MR. BASHAM: It is not a jail.  It is a whole
12  new facility.
13 Q.  (By Mr. Marlowe) That is not the jail?
14 A.  No.  We call it the jail, but it is the
15  transport center.
16 Q.  Did you ever take her to the jail?
17 A.  No.
18 Q.  Where was -- was David Oviedo working there?
19 A.  Yes.
20 Q.  He was the guy that was the intake person or
21  what was his --
22 A.  Transport booking officer.
23 Q.  He was the transport booking officer?
24 A.  Yes.
25 Q.  She got booked in there?

---

Page 27

1 A.  I believe so, sir.
2 Q.  Did she ever -- was she ever placed in a
3  shower?  Disrobed and placed in a shower?
4 A.  She was never disrobed during while I was
5  present.
6 Q.  Did she ever take a shower?
7 A.  What it was is we called medics to the scene
8  to check her again at the jail.  Paramedics arrived,
9  they checked her, said she was okay.  She was only
10  complaining of the Mace.  The process of decontamination
11  is rinse her face with water.  They said she needed to
12  be decontaminated.
13     I assisted Officer Oviedo and the firefighters
14  in taking her to the shower so she could wash her face.
15  The shower was turned on.  It is a removable one where
16  you can rinse your face.  She was told to rinse her
17  face.  She was rinsing her face in the water, and then
18  she just jumped in the shower on her own and was rinsing
19  her face inside the water.  She never took off her
20  clothes at any time, sir.
21 Q.  She never took off her clothes at any time?
22 A.  No.
23 Q.  She was always fully clothed?
24 A.  Yes, sir.
25 Q.  Were there any female officers there?

---

Page 28

1 A.  No.
2 Q.  There was only you and Officer Vigil and David
3  Oviedo?
4 A.  I don't believe Officer Vigil was there, sir.
5 Q.  He was not there?
6 A.  I don't believe so, but I am not sure.
7     MR. BASHAM: And the firefighters.
8     THE WITNESS: I believe there was two
9  firefighters there.
10 Q.  (By Mr. Marlowe) Who were they?
11 A.  I don't recall their names.  I think -- I
12  believe one of them was Jack -- I don't know his last
13  name, and I think the other one may have been -- I don't
14  even know his name.  He is the fire chief now, but I
15  don't -- I don't know exactly who they were.  I think
16  those may have been the ones, but I am not 100 percent
17  sure.
18 Q.  Okay, and were you there while she was --
19  until she finished being in the shower?
20 A.  Yes.
21 Q.  What happened after that?
22 A.  So after that, I gave her a towel, she dried
23  off, took her back over to the booking area.  That is
24  when I told her that she was under arrest for the DWI.
25  I read her the New Mexico Implied Consent Act and asked

---

Page 29

1  her if she agreed to be tested.
2     Let's see, I believe she first agreed to be
3  tested, and then she -- afterwards she immediately
4  stated no, and she said that she wasn't driving.  So I
5  read her consequences for refusal, and she still refused
6  to be tested.
7 Q.  You never saw her driving though; did you?
8 A.  What is that?
9 Q.  You never saw her driving?
10 A.  No, I did not.
11 Q.  Okay.
12 A.  The reason the DWI was done is under the
13  statement from Officer Ortega.
14 Q.  Okay.  Was that the -- that was the end of it
15  for you?
16 A.  Let's see here.  After that, that is when I
17  went back to the hospital, and I spoke to Officer
18  Ortega, and I got her full statement from there.
19 Q.  You went back, and is that statement part of
20  your report?
21 A.  Her statement?
22 Q.  Yes.
23 A.  No.  What I did is I got a verbal statement
24  from her.  Then after she was released from the
25  hospital, she went home.  She typed me out a statement,

---

# EXHIBIT D



## CITY OF ESPAÑOLA
DEPARTMENT OF PUBLIC SAFETY
HOLDING AND TRANSPORT FACILITY
Mayor Alice A. Lucero

LEO R. MONTOYA
Chief of Police

JOSE TED GARCIA
Director

# Memorandum

**Date:**

**From:** Española Detention Center

**Subject: Refusal of Medical Attention**

---

I _Shannon Baum_ (Detainee Name) DOB: _11-22-76_ am refusing medical attention from the Española Police Department and The Española Detention Center on _6-6-11_ at _2014_ HRS.

Inmate Signature: _Baum_

Booking Officer: _____



EXHIBIT
6
BAUM

1316-B Calle Adelante, Española, NM 87532 ≡ (505) 747-6024 ≡ Fax (505) 747-7032